IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| LINDA M. BURKE, | ) | |
| Plaintiff, | ) | Civil Action No. 5:15-cv-74 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Linda M. Burke asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 9. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is supported by substantial evidence.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 416.920(a)(4). The applicant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Burke applied for SSI on March 27, 2012, alleging disability caused by arthritis in her knees, elbows, shoulders, neck, and hands; bone disease; enlarged liver; bulging discs in her back; and nerve damage in her neck. Administrative Record ("R.") 165, 195, ECF No. 14. At the time of her alleged onset date of March 14, 2012, Burke was forty-six years old. R. 165. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 68–78, and reconsideration stages, R. 81–94. On June 10, 2014, Burke appeared with counsel at an administrative hearing before ALJ Brian Rippel. R. 30–62. Burke testified about her past work, medical conditions, and the limiting effect these conditions had on her daily activities. A vocational expert ("VE") also testified regarding the nature of Burke's past work and her ability to perform other jobs in the national and local economies.

The ALJ denied Burke's claim in a written decision issued on July 10, 2014. R. 14–25. He found that Burke had severe impairments of degenerative disc disease and radiculopathy of the cervical spine, degenerative disc disease of the lumbar spine, and degenerative changes of the knees. R. 16. He also determined that these impairments did not meet or medically equal the severity of a listed impairment. R. 18–19. As to Burke's residual functional capacity ("RFC"), the ALJ found that she could perform light work[1] and occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. R. 19–23. Relying on this RFC and the testimony of the VE, the ALJ found that Burke could perform her past relevant work as a

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

3

housekeeper and perform other jobs existing in the national and local economies, including dining room attendant/silver wrapper, laundry aide, and deli clerk. R. 23–25. Therefore, the ALJ determined that Burke was not disabled. R. 25. The Appeals Council denied Burke's request for review, R. 1–5, and this appeal followed.

III. Facts

A.    *Relevant Medical Evidence*

In August 2008, Burke visited Kenneth B. Perkins, P.A., of Middlebrook Family Medicine ("Middlebrook"), primarily for abdominal issues and alcohol abuse. R. 270. P.A. Perkins also noted that Burke could not abduct her right shoulder above 90 degrees, had cervical spine tenderness at C5 and C6, and had decreased grip strength on the right. R. 270. On September 19, Burke had an MRI of her cervical spine. R. 281. Imaging revealed endplate changes and disc space narrowing of C5-6 and C6-7 and small bulge at C4-5 without mass effect. *Id.* The report also noted diffuse disc ridge complex resulting in bilateral foraminal narrowing and minimal mass effect on the cord and nerve roots at C5-6 with similar results at C6-7. *Id.*

In December, P.A. Perkins found Burke's lower extremity muscle strength and sensation to be intact. R. 347. In January and February 2009, P.A. Perkins assessed decreased abduction of Burke's left shoulder. R. 298, 300. At appointments throughout 2009, Burke was tender to palpation in her lumbar spine at L4 and L5. R. 298, 337, 341, 343. X-rays taken in June showed bilateral spondylolysis at L5-S1. R. 364. In July, P.A. Perkins found that Burke had normal gait and negative straight leg raise test. R. 337. He noted that her X-ray was "negative" except for some spurring, and he ordered an MRI. The MRI revealed mild retrolisthesis at L4-5 and a small disc bulge without mass effect; anterior subluxation, spondylolisthesis, and a right foraminal

4

bulge at L5-S1 with questionable minimal mass effect on the L5 nerve root; and a bulge and small disc herniation at L3-4 with minimal mass effect on the L3 nerve root. R. 362.

Burke underwent electromyography ("EMG") testing on June 22, 2010. R. 359–61. Finding abnormal test results, Peter Konieczny, M.D., noted evidence of chronic left C7 radiculopathy without denervation, but no right radiculopathy or left median mononeuropathy at the wrist. R. 360. After reviewing these results, P.A. Perkins referred Burke to the Neurosurgery Department at the University of Virginia Medical System ("UVA"). R. 408.

On August 24, Gregory A. Helm, M.D., Ph.D., a neurosurgeon at UVA, evaluated Burke for pain in her neck, lower back, shoulders, and upper extremities. R. 312. He found good strength and sensation in her lower and upper extremities, noted that she was not myelopathic, and ordered a CT/Myelogram of her cervical and lumbar spine. *Id.* During an appointment in November, Dr. Helm noted some lateral stenosis in the cervical region and a slip of L5 on S1. R. 430. He recommended that Burke engage in two months of physical therapy, and if that did not improve her neck pain, he would talk to her about cervical surgery.

In January 2011, P.A. Perkins and Burke discussed Dr. Helm's treatment plan. R. 508. Burke said she had not noticed improvement. P.A. Perkins noted cervical tenderness, decreased muscle strength of the biceps and triceps on the right upper extremity, slightly decreased grip strength on the right compared to the left, tenderness at L4-5, and equal bilateral lower extremity strength. On February 21, Burke complained to P.A. Perkins of experiencing pain in her upper extremities, shoulders, elbows, hands, knees, and neck. R. 398. He noted that her cervical spine area remained tender. On exam, P.A. Perkins found reduced grip strength in Burke's upper extremities. He referred her back to the Neurosurgery Department at UVA, ordered knee X-rays, and prescribed Vicodin for her knee pain. The record, however, contains no further treatment

5

notes from the Neurosurgery Department at UVA. X-rays of Burke's knees taken on March 1 showed degenerative changes of both knees consisting of mild narrowing of the medial compartments, probable minimal narrowing of the patellofemoral compartments, no acute bony abnormalities, and no loose body or joint effusion. R. 420.

On March 9, Burke had an intake assessment at the Valley Community Services Board ("VCSB") for "help with her drinking." R. 477–79. She reported having one mental health counseling session in 2010, and she discussed her history of alcohol abuse and the problems in her relationship with her son. On mental status exam, Burke was oriented in all spheres, minimally cooperative, and pleasant but guarded. Her speech was normal, her insight and judgment were poor, she exhibited no evidence of hallucinations or delusional thinking, and she appeared to have low-average intelligence. The counselor diagnosed alcohol dependence and parent-child relationship problems. In June, Burke was admitted to alcohol detox for a week and discharged with a diagnosis of alcohol dependence and a recommendation that she pursue counseling at the VCSB. R. 480–81. After a couple of counseling sessions, Burke was discharged with a referral to another counseling group because she insisted, apparently in contravention of program rules, on continuing to use her prescribed opiates to manage her pain. R. 484. In August, Burke was evaluated at Augusta Health Behavioral Services for alcohol dependence and related social and relationship problems. R. 496–98. Her appearance, behavior, orientation, speech, thinking, insight, judgment, and memory were assessed to be within normal limits. Additionally, she appeared anxious, and Burke reported that pain interfered with her sleep. The counselor recommended that Burke attend weekly counseling sessions and ongoing Alcoholics Anonymous meetings.

On March 16, 2012, Cindy W. Almarode, a nurse practitioner at Middlebrook, examined Burke for complaints of left elbow pain. R. 500–02. The nurse practitioner noted swelling and tenderness in the left elbow, but no joint mobility abnormalities. Burke had full strength and range of motion without pain. Additionally, Burke was alert and oriented, and she had no psychomotor, mood, affect, speech, or thought impairments. The nurse practitioner made no findings concerning Burke's history of cervical or knee pain. On March 30, Burke complained of increased pain in her left elbow and increased pain and numbness in her upper extremities. R. 562. N.P. Almarode's findings on exam were unchanged. R. 561.

Through the VCSB, Burke was admitted to Boxwood, a residential treatment facility, on May 30 for treatment for alcohol dependence. R. 623–27, 645–63. She completed the program and was discharged on June 27. In December 2013, Burke reported that she had been sober for a year and a half. R. 678.

On November 28, 2012, Burke reported to John Marsh, M.D., a primary care physician at Middlebrook, that she had been experiencing back pain and anxiety. R. 568. As to mental status, Dr. Marsh found that Burke had an appropriate mood and affect and no psychomotor, mood, affect, speech, or thought impairments. R. 570. He assessed anxiety without evidence of significant depression. On physical exam, Burke exhibited no cervical spine or neck joint mobility abnormalities, but she had pain with neck range of motion. R. 569. Dr. Marsh noted no abnormalities in Burke's extremities. R. 570. Her gait was normal, but she had pain upon palpation of her entire spine and decreased range of motion in her right shoulder. R. 570.

The record contains notes written on prescription paper from Middlebrook dated January and February 2013 that state Burke was unable to work because of arthritis, anxiety, neck and back pain, and marked degenerative spine disease. R. 671. In response to a letter from Burke's

attorney dated April 17, Dr. Marsh opined that arthritic changes in Burke's spine limited her ability to work. R. 674.

On December 12, Burke followed up with N.P. Almarode. R. 678–82. Burke denied experiencing neck pain or stiffness, but reported back pain. R. 679–80. She also denied experiencing pain, numbness, or tingling in her upper and lower extremities. R. 680. She had no gait problems and denied having any limb pain when walking. R. 679–80. Burke reported experiencing anxiety, but not anxiety attacks, depression, or difficulty concentrating. R. 680. On exam, N.P. Almarode found no gait problems; normal range of motion in the neck, but pain on motion; normal upper and lower extremities; no arthritic changes in joints except her hands; back tenderness only at the costovertebral angle; no limit on range of motion in the back; normal reflexes and sensation; and no neuropathy. R. 680–81. N.P. Almarode observed that Burke appeared anxious and depressed, but was alert, had clear thought processes, and had no memory loss. R. 681. She refilled Xanax to treat Burke's anxiety. *Id.*

B. *Burke's Submissions and Testimony*

In function reports submitted to the state agency, Burke said she did only a few activities, such as making sandwiches, doing laundry, watching television, talking with others, and going to the doctor. R. 216–21. She did not drive because of arm and hand pain, and her kids shopped for her. R. 219.

At the administrative hearing, Burke testified that her back became swollen when she sits "too long" and she could not lift her arm above her head. R. 42. She experienced pain in her shoulders and elbows and numbness in her fingers so that she could not hold a gallon of milk and had trouble holding utensils and writing. R. 43–44, 47–48. She also had pain in her lower back. R. 44. Most days she sat in her bedroom or on a couch in another room in her residence. R. 45.

She tried to vacuum, but had to stop and lay down after five minutes because her back hurt. *Id.* She then would take pain medicine and could do "something" for three or four hours. *Id.* Her medications made her sleepy and affected her ability to concentrate. R. 46. Burke had bad days when her symptoms prevented her from getting out of bed. R. 44–45, 47.

## IV. Discussion

Burke challenges the ALJ's decision on a number of grounds. Pl. Br., ECF No. 17. She argues that the ALJ erred in finding that her spine impairments did not meet Listing 1.04, Pl. Br. 5–7, and in assessing the credibility of her report of symptoms and limitations, *id.* at 7–12. Burke also takes issue with the ALJ's characterization of the medical evidence, *id.* at 13–14, and his assessment of the opinion evidence, including an opinion from Dr. Marsh submitted to the Appeals Council, *id.* at 14–15. Finally, Burke argues that the combined limitations from her non-severe mental impairments and severe physical impairments render her unable to work. Pl. Br. 5.

### A.        *Listing 1.04*

Burke argues that her spine impairment meets Listing 1.04(A). The listings are examples of medical conditions that "ordinarily prevent a person from working" in any capacity. *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990); *see also* 20 C.F.R. § 416.925(a). A claimant's severe impairment "meets" a listing if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration requirement." 20 C.F.R. § 416.925(c)(3); *see also Zebley*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

An adult claimant whose severe medically determinable impairment meets a listing is presumed disabled regardless of his or her vocational profile. 20 C.F.R. § 416.925(c). Thus,

proving "listing-level severity" requires the claimant to demonstrate a greater degree of physical or mental impairment than the baseline statutory standard of being unable to perform "substantial gainful activity." *Zebley*, 493 U.S. at 532. A claimant who can satisfy a listing "is entitled to a *conclusive* presumption that [she] is [disabled]." *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (emphasis added) (citing *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)); *accord* 20 C.F.R. § 416.920(a)(4)(iii). Thus, the ALJ generally must identify the relevant listed impairments and "compare[] each of the listed criteria" to the medical evidence in the claimant's record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *see also Radford*, 734 F.3d at 295.

To meet Listing 1.04(A), a claimant must demonstrate a disorder of the spine, such as degenerative disc disease, resulting in compromise of a nerve root or the spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.04(A). These four elements must also be present in conjunction with the duration requirement, i.e., "that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. The Fourth Circuit in *Radford* rejected the Commissioner's argument that the claimant must show that each element was present simultaneously and instead held that a claimant can meet the listing "by showing that [she] experienced the symptoms 'over a period of time,' as evidenced by 'a record of ongoing management and evaluation.'" *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, App. 1, 1.00(D)).

Assessing whether Burke's spine impairments met Listing 1.04(A), the ALJ cited the relevant standard and concluded that the objective evidence did not show "listing level nerve root compression." R. 19. Burke takes issue with the ALJ's characterization of the evidence of nerve root compression as not "listing level," and she asserts that Listing 1.04(A) does not contemplate different levels of compression. In other words, the nerve roots are either compressed, in which case one element of the listing is met, or they are not compressed.

The objective evidence arguably satisfies the first few elements of the listing. As evidence of nerve root compression, Burke points to the 2008 MRI revealing minimal mass effect on the nerve roots and spinal cord at C5-6 and C6-7. As to neuro-anatomic distribution of pain, Burke identifies the EMG study from 2009 that showed she experienced radiculopathy at C7 as well as her testimony and subjective reports to Dr. Marsh of back and neck pain.

Burke's argument is ultimately unavailing, however, because even if she were found to have shown the existence of nerve root compression and neuro-anatomic distribution of pain, the record does not contain evidence sufficient to satisfy the necessary elements of limitation in range of motion of the spine or motor loss accompanied by sensory or reflex loss. In December 2008, P.A. Perkins found Burke to have intact lower extremity muscle strength and sensation. In July 2009, he noted a normal gait and negative straight leg raising test. In August 2010, Dr. Helm found good strength and sensation in Burke's upper and lower extremities. In 2012, N.P. Almarode consistently found full strength and range of motion. In December 2013, she found normal range of motion in Burke's neck and back, normal upper and lower extremities, and normal reflexes and sensation. In November 2012, Dr. Marsh found no cervical spine or neck joint mobility abnormalities, no abnormalities in Burke's extremities, and normal gait. To be sure, in one treatment note from January 2011, P.A. Perkins noted decreased muscle and grip

strength in the right upper extremity, but this single instance of an abnormal finding out of nearly five years of normal findings on exam does not undermine the ALJ's determination.

Although the ALJ did not cite specific medical findings in his analysis of Listing 1.04, he discussed the above medical evidence relevant to Burke's back and neck impairments when assessing her RFC. *See Vest v. Astrue*, No. 5:11cv47, 2012 WL 4503180, at *3 (W.D. Va. Sept. 28, 2012) (finding that ALJ's analysis at steps four and five showed claimant did not meet listing). This evidence shows that Burke's spine impairment did not result in limited range of motion or motor loss, and it provides ample support for the ALJ's step three finding that Burke did not meet Listing 1.04.

### B. Severity of Symptoms

Burke challenges the ALJ's evaluation of her statements concerning the severity of her symptoms. The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006). The ALJ must first determine whether objective medical evidence[2] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 416.929(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

---

[2] Objective medical evidence is any "anatomical, physiological, or psychological abnormalit[y]" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 416.928(a).

The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [she] suffers." *Craig*, 76 F.3d at 595.[3] The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c)), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013). A reviewing court will defer to the ALJ's finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio v. Colvin*, 780 F.3d 632, 640 (4th Cir. 2015).

Burke testified that her impairments prevented her from working and left her able to do very little. The ALJ recited her testimony and deemed her statements about the severity of her limitations not entirely credible. R. 20. He questioned Burke's claim that she could do only very

---

[3] The Social Security Administration now cautions that the subjective prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

limited daily activities and noted that it was not verifiable. He also found her reported limitations inconsistent with the medical evidence, which depicts moderate to minimal findings, and Burke's sporadic and conservative medical treatment. R. 20–21.

The ALJ's characterization of the medical findings as moderate to minimal is reasonable and supported by the record.[4] Imaging of Burke's spine showed degeneration, but physicians interpreted the changes, including those in contact with nerve roots or the cord, as minimal. An EMG showed radiculopathy, Burke regularly reported experiencing pain or tenderness upon palpation of her spine, and at times she had elbow swelling, decreased grip strength, and limited range of motion in her shoulder. The majority of treatment notes, however, record normal findings as to strength, range of motion, sensation, and reflexes in her extremities and document Burke's normal gait. The findings on exam undermine Burke's claims that she could walk and stand for only very short periods and that she had severely limited ability to reach and handle objects. To the extent that Burke's statements about her limitations were inconsistent with objective medical findings, the ALJ did not need to accept them. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (finding no error when "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility"); *see also Craig*, 76 F.3d at 595.

---

[4] Burke objects to the ALJ's characterization of the MRI studies as indicating "moderate to minimal findings." Pl. Br. 13 (citing R. 20). The record, as the ALJ discussed, contained cervical and lumbar MRIs showing a "small" bulge and "minimal" mass effect on the nerve root and cord. R. 281, 362. Burke also objects to the ALJ's description of her knee X-rays as showing "only degenerative" changes because the doctor who interpreted the X-rays did not attach this "diminutive statement." Pl. Br. at 13 (citing R. 20). Burke is correct that the doctor did not use the word "only," but he did quantify the narrowing of the medial compartments as mild and the narrowing of the patellofemoral compartments as minimal. R. 420. The ALJ did not simply mischaracterize the imaging results and then, on the basis of those mischaracterizations, dismiss Burke's subjective complaints. Rather, the ALJ reasonably described the doctors' interpretations of those studies, discussed the relevant and related findings on exam, and weighed them against Burke's reported symptoms. Considering the mild and minimal compartment narrowing in Burke's knees, the small bulges and minimal mass effects on the nerve roots of her cervical and lumbar spine, and the mostly normal physical exam findings, I cannot find that the ALJ's discussion of the imaging results shows any error.

14

Moreover, the treatment that she pursued, as noted by the ALJ, was limited. Dr. Helm evaluated Burke for surgery, but he recommended that she try physical therapy first. Although Burke told P.A. Perkins that physical therapy did not help, nothing in the record indicates that she followed up with Dr. Helm for possible surgery. Instead, she treated her spine and knee impairments with pain medication, primarily Vicodin. Burke challenges the ALJ's characterization of her treatment as conservative. This Court and the Fourth Circuit have observed that treatment consisting of medications may be considered conservative. *Dunn v. Colvin*, 607 F. App'x 264, 272–75 (4th Cir. 2015); *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication, physical therapy, and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016). Furthermore, an ALJ may consider the nature of a claimant's treatment in evaluating the severity of her symptoms. *See* 20 C.F.R. § 416.929(c)(3)(iv)–(v); *see also Dunn*, 607 F. App'x at 275 ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . .").

Burke further argues that her treatment improved her functioning only to the limited level she described and no doctor recommended more aggressive treatment that would bring a higher level of functioning. Aside from the potential surgery with Dr. Helm, which Burke did not pursue, Burke is correct that the record does not contain a physician's recommendation that she follow a more aggressive course of treatment. Burke contends the absence of such a recommendation suggests that more aggressive treatment still would not have relieved the severe symptoms she reported. The record is silent on that point and thus does not necessarily support the inference Burke proposes. Moreover, the ALJ drew a different inference: he found that

15

treatment consisting of only medications suggested that her symptoms were not as serious as claimed. Implicit in this finding is the reasonable notion that more serious symptoms require more aggressive treatment. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)) (explaining that "[a]n unexplained inconsistency between the claimant's characterization . . . of [her] condition and the treatment [she] sought to alleviate that condition" can bear heavily on the claimant's credibility). Additionally, the ALJ noted that Burke sought treatment sporadically for her physical impairments. Indeed, she saw N.P. Almarode or Dr. Marsh only three times, from March 2012 to December 2013, after her alleged onset of disability. The ALJ could reasonably determine that this sporadic treatment—once every nine months—coupled with mostly normal exam findings and conservative treatment recommendations were inconsistent with Burke's report of severely debilitating symptoms.

C.    *Opinion Evidence*

Burke challenges the ALJ's assessment of three opinions that she cannot work. Two opinions are written on Middlebrook prescription paper. The signature is indecipherable, but Burke suggests the notes were written by Dr. Marsh. These opinions identify Burke's impairments—arthritis, anxiety, neck and back pain, and marked degenerative spine disease— and offer that she cannot work. The third opinion is from Dr. Marsh. He opined that Burke's arthritic changes in her spine limited her ability to work.

An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 416.927. The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* § 416.927(c). A treating physician's opinion "is entitled to controlling weight if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also* 20 C.F.R. § 416.927(c)(2). Conversely, opinions from non-treating sources are not entitled to any particular weight. *See* 20 C.F.R. § 416.927(c).

An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178. The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. § 416.927(c). Furthermore, in determining what weight to afford a treating source's opinion, the ALJ must consider all relevant factors, including the relationship—in terms of length, frequency, and extent of treatment—between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, the consistency of the opinion with the record as a whole, and whether the treating physician's opinion pertains to his or her area of specialty. *Id.* The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 416.927(c), (e)(2).

The ALJ discussed these three opinions and provided similar reasons for assigning them "little weight." R. 22–23. He found that these opinions were of little value because, as he correctly noted, they did not identify any particular functional limitation. "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 416.927(a)(2). Although these opinions identify Burke's impairments, they do not discuss any specific functional limitation or say what Burke can or cannot do, other than offering that she cannot work. Whether a person is capable of

17

working, i.e., is disabled, however, is an issue reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1); *see also Dunn*, 607 F. App'x at 268 ("[A] medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone."). Although the ALJ must carefully consider a medical source's opinion—including one on an issue reserved to the Commissioner—and should never ignore it, *see* SSR 96–5p, 1996 WL 374183, at *2–3 (July 2, 1996), the ALJ need not afford "any special significance" to the source's medical qualifications, 20 C.F.R. § 416.927(d)(3); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir. 2005) ("The ALJ is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96–5p, 1996 WL 374183, at *3)).

Here, the ALJ did not ignore these opinions. He explained that they were inconsistent with the medical evidence that showed minimal treatment, moderate to minimal imaging findings, and limited clinical findings. R. 22–23. In particular, he noted findings from 2012 and 2013 of no abnormal joint mobility, physical exams within normal limits, no joint or extremity pain, and normal gait. *Id.* As to Burke's mental impairments, the ALJ noted that she reported feelings of anxiety, but denied mood swings or panic attacks, and on exam Burke appeared anxious and depressed, but had normal thought processes. *Id.* From this discussion, the ALJ could reasonably determine that the medical evidence contradicted these three opinions that Burke's impairments prevented her from working.

D.  *New Evidence*

Burke also argues that another Dr. Marsh opinion, which she submitted to the Appeals Council, shows the effects of Burke's impairments on her ability to function in the workplace.

18

On August 5, 2015, Dr. Marsh provided a letter to Burke's attorney. R. 687. Noting that he had treated Burke over many years for osteoarthritis, bilateral carpal tunnel syndrome, degenerative disc disease, spondylosis, peripheral neuropathy, depression, and anxiety, he opined that she would have difficulty with full-time sedentary work and the requirements for concentration, pace, and regular attendance. He further opined that Burke's impairments rendered her incapable of working.

In deciding whether to grant or deny review, the Appeals Council must consider any additional evidence that is new, material, and related to the period on or before the date of the ALJ's decision. 20 C.F.R. § 416.1470(a)(5). "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc)). Evidence of medical impairments and related symptoms that the ALJ discussed in his opinion necessarily relates to the period on or before the date of the ALJ's decision. *See Wilson v. Colvin*, No. 7:13cv113, 2014 WL 2040108, at *4 (W.D. Va. May 16, 2014). The Appeals Council will grant review if it finds that "[t]he action, findings or conclusions of the [ALJ] are not supported by substantial evidence," 20 C.F.R. § 416.1470(a)(3), including any additional evidence that it was required to consider.

Here, the Appeals Council incorporated Dr. Marsh's opinion into the record, R. 5, and it noted in its denial of Burke's request for review that it "considered" this evidence, but found, without explanation, "that the additional evidence does not provide a basis for changing the [ALJ's] decision," R. 2. Under such circumstances, this Court must review the entire record, including the additional evidence, to determine whether substantial evidence supports the ALJ's

underlying factual findings. *Meyer*, 662 F.3d at 704; *Riley v. Apfel*, 88 F. Supp. 2d 572, 577 (W.D. Va. 2000). This can be a difficult task where, as here, the Appeals Council did not explain why the additional evidence did not render the ALJ's "action, findings, or conclusion . . . contrary to the weight of evidence" now in the record. *See Riley*, 88 F. Supp. 2d at 579–80.

A federal court reviewing the Commissioner's final decision, however, is not permitted to make factual findings or attempt to reconcile new evidence with conflicting and supporting evidence in the record. *See Meyer*, 662 F.3d at 707. Courts instead maintain the appropriate balance by reviewing the entire record to determine if there is a "reasonable possibility" that the additional evidence would change the Commissioner's final decision that the applicant is not disabled. *See, e.g.*, *Brown v. Comm'r of Soc. Sec.*, 969 F. Supp. 2d 433, 441 (W.D. Va. 2013). Reversal and remand is required where "the new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.'" *Sherman v. Colvin*, No. 4:13cv20, 2014 WL 3344899, at *10 (W.D. Va. July 8, 2014) (quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013)). The same is appropriate where new evidence undermines the ALJ's factual findings and rationale or fills an "evidentiary gap [that] played a role in [the ALJ's] decision" to deny benefits. *Meyer*, 662 F.3d at 707; *cf. Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (ordering remand where evidence submitted to, but not considered by, the Appeals Council "contradict[ed] both the ALJ's findings and underlying reasoning" for denying Jackson's claim and "reinforced the credibility of Jackson's testimony").

Much of Dr. Marsh's August 2015 opinion is cumulative, and he does not specify the period that it covers. Nonetheless, he identified three functional areas—concentration, pace, and regular attendance—that he opined will cause difficulty for Burke in full-time sedentary work.

20

As in his previous opinions, Dr. Marsh provides little support for his conclusions. He identified his lengthy treatment history and Burke's diagnosed impairments. The ALJ, however, accurately found that the treatment history was sporadic and limited. Moreover, the ALJ discussed Dr. Marsh's clinical findings, as well as those from other medical providers at Middlebrook, and determined that they were minimal. He also noted mental status exam findings within normal limits from Middlebrook treatment records. R. 21. Indeed, Dr. Marsh found that Burke had an appropriate mood and affect and no psychomotor, mood, affect, speech, or thought impairments. R. 570. N.P. Almarode made identical findings in March 2012, R. 501, and in December 2013, Burke reported no difficulty concentrating, R. 680. The ALJ's finding that Dr. Marsh's prior opinion conflicted with the medical evidence applies with equal force to Dr. Marsh's August 2015 opinion. Accordingly, I cannot find that a reasonable possibility exists that this new opinion would change the Commissioner's final decision.

E.    *Residual Functional Capacity*

Lastly, Burke challenges the ALJ's RFC determination. A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments, both severe and non-severe, that are supported by the medical evidence or the claimant's credible complaints, *see Mascio*, 780 F.3d at 638–40. The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his RFC finding, *Mascio*, 780 F.3d at 636, and why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. &*

21

*Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

The ALJ found that Burke could perform light work with some postural limitations. Explaining his RFC determination, the ALJ discussed the medical evidence relevant to Burke's physical and mental impairments. He noted the imaging studies from 2008 and 2009 showing degenerative changes of the cervical and lumbar spine with an effect on the nerve root and cord. He discussed the treatment notes from 2008 to 2013 and found that Burke's medical providers documented mostly normal findings on exam throughout that period. With the exception of decreased right shoulder abduction in 2008 and 2009 and decreased grip strength in 2011, the record does indeed show normal examinations of Burke's extremities, no joint abnormalities, and normal gait. Similarly, the ALJ accurately found that mental status exams regularly produced findings within normal limits, except for notes of anxiety. The ALJ discussed this medical evidence and found that it was consistent with the DDS physicians' and psychologists' opinions, R. 68–78, 81–93, as to Burke's physical and mental functioning, R. 21–22. The ALJ thus adopted the DDS physicians' and psychologists' assessments of Burke's functional abilities as his RFC, *see* R. 19, 21–22, as he may do when their opinions are consistent with the record, *Gordon*, 725 F.2d at 235. This discussion of the opinion evidence, the treatment notes and imaging studies, and the credibility of Burke's report of symptoms provides support for his RFC determination. Accordingly, I find the ALJ's decision is supported by substantial evidence.

V. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's motion for summary

22

judgment, ECF No. 20, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to counsel of record.

ENTER: March 24, 2017

Joel C. Hoppe
United States Magistrate Judge